**Jesse A. TYLER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 6206.**

District of Columbia Court of Appeals.

Argued May 10, 1972.

· Decided March 29, 1973.
Rehearing en Banc Denied June 7, 1973.

Salvatore A. Romano, Washington, D. C., appointed by this court, for appellant.

Ruth R. Banks, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Peter C. Schaumber, Asst. U. S. Attys., were on the brief, for appellee.

Before REILLY, Chief Judge, and PAIR and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

This is an appeal from a conviction of a charge of carrying an unlicensed weapon in violation of D.C.Code 1967, § 22–3204. Appellant assigns as error the trial court's denial of his motion to suppress the gun as evidence claiming that its seizure resulted from an illegal search of his car. Finding that the warrantless search was unreasonable, we reverse.

On September 21, 1971, at approximately 3:30 a. m., the arresting officer responded to a call for assistance from Sergeant John Hendrick who was in the alley in the rear of the 1300 block of Kenyon Street, Northwest. The sergeant did not testify on the motion to suppress, but did testify at trial substantially corroborating the officer's testimony. On the motion to suppress the arresting officer testified that when he arrived he saw the sergeant talking to appellant in front of a 1963 Pontiac. The sergeant told the officer that while he was cruising the alley, he came upon appellant sitting in the automobile on the passenger side with its engine and lights off. The sergeant said that he talked to appellant and he noticed that appellant began to get nervous and "appeared to be attempting to conceal, or was fumbling with something . . . in the area of his seat." He told the officer that he summoned help on the radio and asked appellant to get out of the vehicle. When the officer and his companion arrived on the scene, the sergeant and appellant were standing in front of the Pontiac talking.

The sergeant told the officer to get his flashlight and to shine it inside the car. The appellant and another officer, who had accompanied the arresting officer to the scene, were standing in front of the car at the time. The sergeant went to the driver's side of the car and looked in as the arresting officer opened the car door on the passenger side shining his flashlight in the interior. He testified that he saw a part of a handle of what proved to be a .32 caliber pistol protruding from under the front seat. After retrieving the gun, he placed appellant under arrest.

The appellant's testimony was not unlike the officer's in any material respect except he testified that the sergeant asked for his driver's license and car registration. However, he said that before he could look for them the sergeant ordered him out of the car and he "didn't get a chance" to produce them. There was no evidence offered on the motion to suppress as to ownership of the car, but there is no contention that it was stolen.

 Appellant moved to suppress the gun contending it had been seized in violation of his rights under the fourth amendment. The Government argued that the investigation began as a lawful momentary detention for information "for which probable cause is not required". We have no problem with this[1] for the officers clearly had a right to investigate and inquire as to what the car and its occupant were doing there. However, the Government argued further that "[a]ppellant's furtive actions near the floorboard of the automobile in light of the time and the location in a high crime area must have aroused [the sergeant's] suspicions" and that it was therefore reasonable for the officers to open the car door "so that they could see the area where appellant 'fumbled'."

Although furtive movements of a suspect when combined with other significant factors may warrant further investigation or even a search, there are very few articulable facts here indicating "that criminal activity may be afoot". Terry v. Ohio, 392 U.S. 1, at 30, 88 S.Ct. 1868, at 1884, 20 L. Ed.2d 889 (1968). While appellant's presence in the alley may indicate a parking violation, the surrounding facts are meager at best to establish appellant as a criminal suspect. The sergeant's observation, that appellant was beginning to get nervous and that he appeared to be fumbling with something in the area of his seat, without other grounds to believe the suspect might be engaging in criminal conduct, is not sufficient to support a warrantless search. Watts v. United States, D.C.App., 297 A.2d 790 (1972); United States v. Humphrey, 409 F.2d 1055 (10th Cir. 1969); People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 739, 478 P.2d 449, 459 (1970); People v. Pitts, 40 Mich.App. 567, 199 N.W.2d 271 (1972).

1. Von Sleichter v. United States, D.C. Cir., 472 F.2d 1244 (Decided June 15, 1972); Hicks v. United States, 127 U.S. App.D.C. 209, 382 F.2d 158 (1967).

Neither do the facts bring this case within any of the exceptions to the warrant requirement set forth in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See generally* Annot., 10 A.L.R.3d 314 (1966). We must deem the opening of the car door after appellant had exited the car the beginning of a search. But appellant here had not been accused of any criminal activity, nor had he been charged with illegally parking. In short, before the officers opened the car door there was no indication appellant had done anything for which he would be taken into custody. The Government's reliance on McGee v. United States, D.C.App., 270 A.2d 348 (1970), where there was a search incident to an arrest for the purpose of protecting the officers, is misplaced. Here the search could be described as a search prior to an arrest which may not be sustained if made without a warrant or probable cause, or the owner's consent.[2] In a companion case to Terry v. Ohio, *supra*, the Supreme Court said: "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

The Government contends that the evidence came into the plain view of the officer and is therefore within an exception to the requirement of a warrant to search. It relies on United States v. Johnson, 143 U.S.App.D.C. 215, 442 F.2d 1239 (1971); Davis v. United States, D.C.App., 284 A.2d 459 (1971); and Dorsey v. United States, 125 U.S.App.D.C. 355, 372 F.2d 928 (1967).

None of these cases would seem to offer much, if any, support for the Government's position. United States v. Johnson, *supra*, presented a situation of the police giving chase to a car that did not have a 1970 license sticker. The vehicle did not stop when the officers turned on their siren and dome light and it ran a red light before the car stalled. The United States Circuit Court for the District of Columbia held that the officer was lawfully entitled to approach the car, to require the driver to get out (if that would have been necessary, which it was not because appellee [Johnson] did so voluntarily) and to conduct a protective frisk for weapons. The court stated that "the [narcotic] capsules were thereby put in plain view of anyone approaching the car on lawful business" since Johnson got out of the car leaving the door open and the car floor illuminated by the automatic lighting of the interior dome light. The officer had a right to be where he was when the evidence came into plain view. Additionally, there was no search or intrusion such as occurred here.

Davis v. United States, *supra*, also stands on a different footing than the case at bar. In *Davis* the police had received a radio message that a man named Davis was sitting in a car in the vicinity with a gun. The car was identified as a white Rambler and its location and license plate number were given. The police checked out all of these factors before they asked appellant to get out and then opened the other car door. The court in *Davis* said that because the man in the car was reported to have a gun, asking him to get out constituted a reasonable investigative precaution. The court added that it was prudent police work for the officers to protect themselves by keeping a constant view of the man by opening the other car door as he exited. Such a justification does not exist in the case at bar as there was no police report accusing appellant of having a gun, nor was there any reason to believe a crime other than a parking offense had been committed. Further, appellant had already exited the car.

In Dorsey v. United States, *supra*, the officers were in an area at night where the squad constantly received complaints about narcotic peddling and the court held

2. *See generally* Annot., 89 A.L.R.2d 715 at 740 (1963); People v. Roache, 237 Mich. 215, 211 N.W. 742 (1927).; Boyd v. State, 198 Ind. 55, 152 N.E. 278 (1926); People v. Jordan, 37 Misc.2d 33, 234 N.Y.S.2d 323 (1962).

that when they recognized appellants (sitting in a car) as persons with narcotics records, they were entitled to extend the preventive patrolling mission to the extent of approaching the car and observing what was going on inside. The narcotics were seen by the officers in plain view through the car window. No doors were opened by the officers in *Dorsey* and the officers had a right to be where they were when they saw the narcotics. We have no problem with those decisions, but they are inapposite here.

The United States Supreme Court has said that the plain view doctrine applies to

. . . objects falling in the plain view of an officer who has a right to be in the position to have that view. . . . [Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).]

This raises the question as to whether or not the arresting officer had the right to be in the position he was in when the gun came into plain view. This court relied on the *Harris* opinion in deciding Wise v. United States, D.C.App., 277 A.2d 476 (1971), where the officers' interest was prompted by a radio run regarding a robbery. There the court observed

. . . there was no search here. The narcotics were observed in plain view . . . . when appellant unsuccessfully attempted to conceal them. It follows that the legality of the seizure is not to be governed by the character of the arrest, if indeed one had occurred, but by the right of the officers to be in the position they were to obtain the plain view. . . [277 A.2d at 477.] (*Footnotes omitted.*)

We note in this regard that Justice Stewart, speaking for a plurality of four Justices[3] in Coolidge v. New Hampshire, *supra,* said:

Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. . . .

. . . . . .

In each case, this initial intrusion is justified by a warrant or by an exception such as "hot pursuit" or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence. . . . [403 U.S. at 465, 467, 91 S.Ct. at 2037, 2039.]

The dissenting Justices did not disagree with the proposition enunciated in *Harris* that it must appear that the officer had "a right to be in the position to have that view" if the plain view doctrine is to be applied, but dissented for other reasons.

Justice Black, dissenting,[4] recognized that "the 'initial intrusion' which brought the police within plain view of the automobile[5] was legitimate." And Justice White, dissenting, with whom the Chief Justice joined, noted that in that case "the Pontiac was in plain view of the officers who had legally entered Coolidge's property to effect his arrest."[6]

We conclude that the aforementioned requirement for "plain view" in Harris v. United States, *supra,* has not been disturbed by Coolidge v. New Hampshire, *supra.*

In the case at bar, the opening of the car door was an intrusion that has not been justified by appellee as coming within any of the exceptions to the need for a warrant to search. The Government has not shown that the officer who opened the door and upon using a flashlight saw the gun in plain view had "a right to be in the position to have that view." The officer had opened the car door in order to see

3. Justice Harlan concurred in the result.

4. Coolidge v. New Hampshire, 403 U.S. 443, 506, 91 S.Ct. 2022, 2058, 29 L.Ed. 2d 564 (1971).

5. The automobile was treated as evidence against the defendant.

6. Coolidge v. New Hampshire, *supra* note 4, at 522, 91 S.Ct. at 2066.

what was inside. He could not have been searching for the fruits, implements or evidence of a crime since there would be none for the offense of parking in an alley for which the only possible police action was a citation to the driver. Dickerson v. United States, D.C.App., 296 A.2d 708 (1972).

In our decision in *Dickerson, supra*, it was held that even where there had been a custodial arrest of the suspect (for altered tags and registration) the officer who drove the suspect's car to headquarters conducted an unauthorized search when he reached under the front seat of the subject's car.

Neither does the search appear to be reasonably related to the protection of the officers.[7] "[T]he officers had no complaint or report of a crime, had never seen appellant before and did not observe him engage in unlawful conduct." Robinson v. United States, D.C.App., 278 A.2d 458, 459 (1971). There was no reason to think that appellant was about to become the subject of a custodial arrest which would warrant the officers taking reasonable steps to protect themselves. He was standing at the time in front of the car with a third officer so that the contents of the car posed, at most, a minimal threat to the officers.

The dissent in this case relies on and, in our view, would extend the holding in Terry v. Ohio, *supra*. In that case the Supreme Court was careful to limit the scope of its decision when it said:

We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that *criminal activity* may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. . . . [Emphasis supplied.] [392 U.S. at 30, 88 S.Ct. at 1885.]

We do not find that the background facts here meet the foregoing standard.

Of equal significance to the legality of the search in this case is the language of the Supreme Court at page 19 of that opinion, at page 1878 of 88 S.Ct. wherein it limited the application of the *Terry* doctrine by saying: "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Despite our displeasure in feeling compelled to apply the suppression rule, we do not believe that we can relate Supreme Court language in *Terry* to the facts we have at hand.

Finding as we do that the warrantless search does not come within any of the exceptions and since we are still bound by the exclusionary rule,[8] we reverse as the motion to suppress must be granted.

Reversed.

REILLY, Chief Judge (dissenting):

Of recent years, it has become almost standard practice in the defense of criminal prosecutions to avoid trials on the merits by moving to suppress incriminating evidence on the ground, real or imagined, that it was obtained by an unreasonable search or seizure. In all too many cases —of which I am afraid this is one—the effect of suppression orders is to free the

---

7. Lane v. Commonwealth, 386 S.W.2d 743, (Ky.1964). *See also* Annot., 10 A.L.R.3d 314 (1966).

8. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Coolidge v. New Hampshire, *supra* note 4, *but cf.* Black, J., dissenting 403 U.S. at 496, 91 S.Ct. 2022.

guilty and subject police officers on night patrol to additional hazards.

Despite growing challenges by learned jurists and law enforcement experts to the exclusionary rule, we recognize that where Fourth Amendment rights are asserted we are bound by Supreme Court constructions [1] of this constitutional provision. But it is certainly not the obligation of appellate courts to extend the application of the exclusionary rule beyond the scope of these decisions, particularly in situations where the impact on law enforcement is damaging.

As I know that my colleagues agree with these general propositions and in this case have been at pains to consider the leading decisions of the Supreme Court before deciding to overrule the trial court's denial of the motion to suppress, it is with reluctance that I express my disagreement with the majority. I do so only because I deem that the facts developed by the testimony of the arresting officers do not warrant the conclusion that the Supreme Court's pronouncements in *Terry, Harris,* and *Coolidge,* compel us to find a Fourth Amendment violation.

The basic holding in *Terry* is that a policeman may stop a person whose conduct he appraises as suspicious—even though it is lawful—for interrogation, and then before putting any questions to him, frisk him for weapons if the officer believes that he is armed and dangerous. Apparently the mere observation of the suspicious conduct which justifies the stop also provides the requisite "articulable fact" for justifying the officer for entertaining such a belief, because in *Terry* the suspect frisked was a stranger to the policeman. Nor was there any evidence of a suspicious bulge in the suspect's clothing or any gesture on his part suggestive of concealing or reaching for a weapon.

The majority opinion views the presence of appellant in an unlighted car parked in a dark alley at 3:30 in the morning as falling short of an "articulable" fact from which an inference of potential criminal activity could be drawn, except the possibility of a parking violation. This misses the point, for as *Terry* emphasizes, conduct does not have to be unlawful to bring it into the category of "suspicious" and hence a proper subject for police investigation. Common experience, I submit, reveals that the presence of a lone man late at night in an unlighted car parked in a quiet residential street—to say nothing of an alley—is not an occurrence that usually would pass unnoticed. A passerby happening upon such a person might well be somewhat startled. The purpose of the solitary occupant is susceptible of a wide variety of conjectures. Conceivably he is at the wheel of a getaway car awaiting the emergence of a housebreaking confederate. He might be casing the neighborhood for projected burglaries, or planning an ambush for a robbery victim. His presence to be sure might be due to a number of less sinister reasons, *e. g.*, the occupant of the car could be a detective on "stake-out" duty; or a neighbor or social visitor overcome by sleep or sudden illness. In any event, a prudent resident of the neighborhood, and certainly a trained policeman, might well conclude that the phenomenon merits investigation.

Thus I find it difficult to fault the police officer in this particular case for asking appellant to get out of his car and answer questions. It should be remembered that in *Terry*, the "articulable" suspicious circumstances merely consisted of two men —later joined by a third—loitering in front of a store and occasionally looking into its display window. Such behavior can scarcely be deemed susceptible of more sinister inferences than that of appellant's here.

Once it is recognized that the incident which attracts the officer's attention is

---

1. Some of these comments and considerations are summarized in Chief Justice Burger's dissent in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 413, 415, 91 S.Ct. 1999, 29 L.Ed. 2d 619 (1971).

suspicious enough to permit a stop, the *Terry* decision—as I have pointed out—allows the officer to make a limited weapons search for his own protection. Nothing in that opinion, however, suggests that such search must be confined to the clothing of the suspect. Obviously, if the officer suspects that the man he is about to question may have concealed a weapon in a readily accessible spot, *e. g.*, a brief case, an adjacent drawer, a nearby car, where he can pick it up and use it, he is equally justified in taking appropriate protective measures. In this instance, the officer did have some reason for entertaining such a suspicion. He testified that when his headlights hit the windshield of appellant's car and illuminated the interior, he saw its occupant bending over as if he were fumbling with an object on the floor. Granted that he could not see appellant's hands or the lower part of his arms, he must have seen something to make him apprehensive, otherwise he would scarcely have summoned another squad car to the scene. Thus the officer's description of what he had perceived in his brief glimpse of appellant as he approached can hardly be deemed an afterthought on the witness stand to explain why he later instructed his fellow officer to go back to the car and turn his flashlight on the floor.

Despite the eventual discovery of the gun, it might be argued that none of the police was in any danger while the occupant of the automobile was standing at the front bumper with the officer who had first come upon him, and therefore protective action was unnecessary. Such view fails to take into account the temporary character of the situation. As the interview at the front of the car had provided no grounds for arresting appellant, the first policeman was faced with the prospect of having to terminate the temporary detention and allow appellant to return to the car, thereby exposing himself to a possible deadly shot if his suspicion that the occupant of the car had concealed some lethal object turned out to be correct.

These circumstances were entirely different from those preceding the warrantless search of automobiles disapproved in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), or authorities controlling in this jurisdiction *e. g.*, Mayfield v. United States, D.C.App., 276 A.2d 123 (1971), where the possible contents of the car posed no danger to the officers—the driver of the car having no access to it while in custody at a police station. *Coolidge* is also distinguishable on two other grounds: (1) the officers had opportunity to apply for a warrant to search the car—a factor not present here, and (2) contraband was not involved. These differences were deemed of crucial importance by the Court of Appeals for the Third Circuit in a recent case, United States v. Menke, 468 F.2d 20 (1972).

Moreover, the officer who discovered the gun testified that such object would have been in plain view had he flashed his light through the window rather than opening the door. State v. Jones, 267 So. 2d 559 (La.Sup.Ct., 1972); Commonwealth v. Haefeli, 279 N.E.2d 915 (Mass.1972). And because reasonable prudence in protecting his fellow officer justified his looking into the car, the officer had a right to be in the position he was when the gun came into his sight. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). As appellant himself had left the door on one side of the car open, he can scarcely complain of the officer's facilitating his scrutiny of the car's interior by opening the opposite door. In any event, as I view the matter, an even more extensive search to foreclose appellant's opportunity to avail himself of an accessible weapon when he returned to his car would have been justified.